## NORTH CHESAPEAKE BEACH LAND AND IM-PROVEMENT COMPANY *v.* MAURICE T. COCHRAN.

[No. 99, October Term, 1928.]

*Decided January 31st, 1929.*

The cause was argued before Bond, C. J., Adkins, Offutt, and Parke, JJ.

*L. B. Keene Claggett,* with whom were *J. Briscoe Bunting* and *Bartlett, Poe & Claggett* on the brief, for the appellant.

*Benjamin Hance* and *John B. Gray, Jr.,* for the appellee.

Offutt, J., delivered the opinion of the Court.

Maurice T. Cochran, while engaged in driving piles for the construction of a pier on the property of the North Chesapeake Beach Land and Improvement Company, at North Beach on the Chesapeake Bay in Calvert County, Maryland, was, on October 29th, 1926, "caught in the working cable while he was working with the engine" and severely injured. On the fifteenth of the following July he filed with the State Industrial Accident Commission a claim for compensation against the North Chesapeake Beach Land and Improvement Company and John W. Hayes, as employers. These two respondents disputed the claim on the ground that, at the time the accident occurred, the claimant was not employed by them, but was at work as an independent contractor, and was not within the scope of the workmen's compensation statute.

A hearing was had on that issue, and at its conclusion the claim was disallowed. The claimant thereupon appealed to the Circuit Court for Calvert County, where the case was tried before the court and a jury on the following issues, to wit:

"1. Was the claimant, Maurice T. Cochran at the time of the injury to him on October 29th, 1926, an independent contractor with respect to the work then being done by him?

"2. Was the claimant, Maurice T. Cochran, at the time of the injury to him on October 29th, 1926, an employee of

the North Chesapeake Beach Land and Improvement Company?"

The verdict and judgment at that trial being for the claimant on those issues, the defendants took this appeal.

In connection with those issues to which we have referred, the claimant offered evidence which tended to prove the following facts, which for brevity, will be stated in narrative form: Whilst Cochran, who was a carpenter and builder, was engaged in supervising the construction of a shed on appellant's land, he was approached by John W. Hayes, its president, who told him that "he" proposed to build a pier out over the waters of the Chesapeake Bay, and asked Cochran if he could drive piles. Cochran said that he could if he had anything to drive them with, and he and Hayes then discussed the terms upon which he would undertake to drive the piles for the construction of the proposed pier. As a result of that discussion Hayes agreed to pay either $3 or $3.50 per pile for each pile driven by Cochran, to furnish all material needed for the construction of a pile driver, and, when the actual work of driving the piles began, to furnish two or more men as needed to assist Cochran in that work. Cochran on his part agreed to furnish all labor used in constructing the pile driver, and to pay for it out of the contract price of $3 per pile, and, when the actual work of driving the piles began, to furnish and pay two men to assist in that work, and to drive as many piles as Mr. Hayes wanted, in whatever manner he directed, as "long as" he "could make wages at $3 per pile."

Later he was informed by Hayes that he was ready to start work on the pier, that the material for the pile driver was ready, and directed to inspect an old pile driver and "copy that in building a new one," and was given a sketch or plan of the proposed pier. Shortly after that he began the construction of the pile driver, and, while engaged in that work, Hayes criticized its construction, and suggested a change which Cochran made. Upon its completion he was aided in setting it up by employees of Hayes.

When the machine was ready for operation and Cochran

was ready to begin driving piles, he was told to wait until Mr. Hayes arrived. He did wait, and when Hayes arrived he told him, Cochran, how deep to drive the piles, and suggested that he should make the platform wider. When the work was actually begun, it was found that certain rollers would be needed, and Hayes told Cochran where to get them, and he went, with men regularly employed by Hayes, in the company's truck, to get them. Soon after the work started, the pile driver slipped and fell into the water, and Hayes' employees and teams and tractor helped to replace it. As a result of that accident the pile driver was damaged, and Hayes told Cochran to secure duplicates of the damaged parts, and also certain necessary "tackle" to repair it. It was repaired and work resumed, and on the afternoon of the day on which work was resumed, Hayes' foreman and two men, presumably employees of his, helped Cochran to operate it and drive piles. Cochran had no fixed time for going to work or stopping, and he paid the men employed by him. At some time during the progress of the work, Hayes gave Cochran a check for $100, "out of which he could pay the men," and he did pay his men out of that fund, and also paid for the gears and tackle purchased for the repair of the machine from it. He drove altogether about twelve or fifteen piles prior to his injury.

For the defendant there was evidence tending to prove that Hayes, acting for the North Beach Improvement Company, received two bids for driving the piles, one of $4 per pile from a Mr. Hartge, and one of $3.50 from Cochran, and testified that "he saw Mr. Cochran, and closed the contract with him on the basis of $3.50 per pile, all piles to be furnished and delivered by his company, Mr. Cochran to do all of the work; that Cochran was to be furnished the material with which to build a pile driver, all of the expense in connection therewith to be borne by Cochran; that Cochran built the pile driver and began driving the piles one Saturday in October, 1926, at which time, he, the witness, was present; that he called Cochran's attention to the platform of the pile driver as being too small and Cochran said he would remedy

it; that he, the witness, had nothing to do with the men to be employed by Cochran in the building of the pile driver and in the driving of the piles, and that he had nothing to do with the wages to be paid these men. That the Sunday following the Saturday that the work of driving the piles began by Cochran, he, the witness, left for a trip to New Jersey and did not return to his home in Washington until October 26th; that upon his return, he learned for the first time of the accident what had happened to Cochran; that he left with his brother a check for $100 to be given to Cochran as a payment on account, and also left with his brother a sketch of the pier to be built and the piles to be driven, according to the sketch; that the check for $100 was intended as a payment on account under the contract with Cochran for the driving of the piles at $3.50 per pile. * * * That he also left with his secretary several blank checks to be filled in and given to Cochran in amounts to be based on the price of $3.50 per pile for the piles, as and when driven; that he had nothing to do with the work except to furnish the piles, and he left orders with his men to keep Cochran supplied with piles; that he exercised no supervision over the work and was absent from October 19th to October 26th; that he did make some suggestions to Cochran about the length of the leads."

At the close of the claimant's case the defendants offered a demurrer prayer, which was refused. They then proceeded with their own case and called witnesses. The effect of that course was to waive any objection to the court's ruling in respect to that prayer. *Wilson Amusement Co. v. Spangler,* 143 Md. 98.

At the conclusion of the whole case the claimant offered seven prayers, of which the fifth and sixth were granted, the seventh conceded, and the others refused; the defendants offered two prayers, of which the second was granted and the first refused. No exception was noted to the refusal of the defendant's first prayer, so that the only question raised by the appeal is whether the trial court erred in granting the fifth and sixth prayers offered by the plaintiff. Neither

prayer went to a recovery; the fifth submitted a definition of the term "independent contractor," while the sixth pointed to certain facts which the jury might consider in determining whether Cochran at the time he was injured was an independent contractor.

We know of no accurate and comprehensive definition of the term "independent contractor," and in our opinion the defendants' fifth prayer does not supply that want. The difficulty arises, not so much from any obscurity in the nature of the office, as from the varying significance given with entire propriety to the words used to define it in different cases. For words may properly mean one thing, when used in connection with one set of facts, and quite a different thing when used in connection with other facts. For instance, in the claimant's prayer, it is said that an independent contractor is one who has contracted to "do a specific piece of work." As an abstraction that statement, while approximately correct (31 C. J. 473), nevertheless stresses what is in many cases a minor consideration, and may or may not be accurate accordingly as we give one meaning or another to the term "specific piece of work." Applied to this case, if it meant driving all the piles needed for the pier, it would not be entirely accurate, for Cochran may have been an independent contractor even though he had contracted to drive only so many piles as he chose, or, to drive piles so long as he could "make wages." In other words, the mere fact that he did not definitely agree to drive all the piles needed for the pier did not conclusively establish that he was not an independent contractor, although it should have been considered in determining whether he was or not. That difficulty may be illustrated by reference to the following cases, in which the question of whether one engaged in the performance of certain work was an independent contractor or not was in issue. In *Higley v. Woodford,* 106 Conn. 284, a woodcutter employed to cut trees at so much a thousand feet was held to be an independent contractor, while in *Flaharty v. Trout,* 290 Pa. 315, a teamster who contracted to haul logs at so much a thousand feet was held

not to be an independent contractor. So in a contract for laying a railroad, it was held that the fact that it should be laid only so far as the employer ordered was not inconsistent with the independence of the contractors. *Powell v. Va. Const. Co.*, 88 Tenn. 692. And it has been frequently held that one may be an independent contractor in respect to certain work, even though the employer reserves the right to control its scope and alter the plans. 19 *Ann. Cas.* 16. So that the statement that an independent contractor is one who contracts to do "a specific piece of work," although accurate enough in some cases, as an abstraction applicable to all cases does not go far enough, and is not entirely accurate as far as it does go. For one may be an independent contractor even though he does not contract to do a specific "piece" of work, if he does contract to do specific work, just as one may not be an independent contractor even though he does contract to do a specific "piece" of work. For whether he is or is not an independent contractor may in either case be determined by other circumstances and conditions incident to the work.

And that brings us to the next element in the definition, that an independent contractor is one who "furnishes and has the absolute control of his assistants." The vice of that definition is that, if we accept it, we must also accept the converse of it, that one who does not furnish and who does not have the absolute control of his assistants, is not an independent contractor, for unless the prayer means that it furnished the jury no guide at all. For why should the jury have been told that an independent contractor is one who "furnishes and has the absolute control of his assistants," if they were at liberty to find that one was an independent contractor who did neither of those things. And while as an abstraction, as far as it goes, that statement is perfectly sound, it does not go far enough to be an accurate guide when applied to such facts as may be found in the record in this case. For one may be an independent contractor even though his assistants are furnished by the employer. 14 *R. C. L.* 73; *Ann. Cas.* 1913 B, 576; *Federal Mining & Smelting Co. v.*

*Thomas,* 99 Okla. 24. And the reservation of some supervisory power over the work, while inconsistent with the word "absolute," is not necessarily inconsistent with the independence of the contractor. 14 *R. C. L.* 68, 69, 70; *Good v. Johnson,* 38 Colo. 440; *Bodwell v. Webster,* 98 Neb. 664; *Simonton v. Morton,* 275 Pa. 562.

Nor is the statement that one who "executes the work entirely in accordance with his own ideas, or with a plan previously given him by the person for whom the work is done, without being subject to the latter's orders in respect of the details of the work, with absolute control thereof," is an independent contractor, entirely correct. The mere fact that the plan of the work was not given to the contractor before the contract was made or the work begun did not conclusively establish the fact of his dependence (note to *Mesmer v. Bell,* 19 Ann. Cas. 16), and while it is usually held that the right of the contractor to control the means of performance is essential to his independence (14 *R. C. L.* 68; 31 *C. J.* 473; *Words and Phrases,* 1st, 2nd and 3d series), that principle is obscured by being submitted as an alternative for the requirement that the work must be done in accordance with a plan "previously given" the contractor.

For the reasons suggested, we regard the definition submitted by the prayer as incomplete and insufficient, and the prayer itself peculiarly obnoxious to the rule so often stated by this court, that instructions to juries should be more than mere abstractions. *White v. Parks,* 154 Md. 195; *Bogatsky v. Swerdlin,* 152 Md. 18, and cases there cited.

Nor can we say that the error in granting this prayer was not injurious. The jury were in effect told by it that, unless Cochran contracted to do a specific piece of work, furnished and had the absolute control of his assistants, and executed the work entirely in accordance with his own ideas, or with a plan "previously" given him by his employer, without being "subject to the latter's orders in respect of the details of the work, with absolute control thereof" he was not an independent contractor.

These several facts were all relevant and material to the

issue before the jury, but no one of them was decisive, be-cause the determination of the issue depended, not on any one of them, but upon all of them, taken in connection with other facts and circumstances in evidence, but not referred to in the prayer, but which nevertheless may have affected the weight and value of those to which it did refer. 31 C. J. 474. The prayer did not, it is true, in so many words, direct a verdict, but in effect it did. For when it told the jury that an independent contractor was one who furnished his own assistants, by fair implication it told them that one who did not furnish his own assistants was not an independent contractor, and since it was undisputed that at least two of the assistants employed in the work which Cochran was doing were furnished by the appellant and not by him, it is not ap-parent how, under that prayer, the jury could have returned any verdict except for the claimant. But, unless we are pre-pared to say as a matter of law that Cochran was not an inde-pendent contractor, that question should have been submitted to the jury for determination by them in accordance with their interpretation of all the evidence before them. 14 R. C. L. 78; note to *Messmer v. Bell*, 19 Ann. Cas. 7. And since the evidence as to certain facts was conflicting, as for instance whether Cochran undertook to drive all the piles needed for the pier, and as more than one inference could have been drawn from others, as for instance whether the act of Hayes in directing where the piles were to be driven was a mere act of supervision, or the assertion of a right to con-trol the means and manner of doing the work, and since all of the facts were interrelated, and each to some extent affected the significance of the others, the existence of the relation was a jury question and not a matter of law.

The sixth prayer instructed the jury that, if they found "that Cochran did not contract to do and complete a specific piece of work or that Hayes retained control and supervision of the work, then these facts tend to show that Cochran was not an independent contractor but was an employee." The vice of that prayer is that to some extent it involves the theory that the retention by the employer of the right to

supervise the work was inconsistent with the relation of independent contractor. But the law is to the contrary, and it seems to be well settled that "the mere fact that the employer reserves a right to supervise or inspect the work during its performance does not make the contractor a servant, where the mode and means of performance are within the control of such contractor. The right of the employer to go upon the premises and see that the work is being done according to the specifications of the contract does not affect the relations of the parties, so as to constitute the employee a mere servant. If the contract provides that the work shall be done 'under the direction' and subject to the approval of the employer, a closer question is presented, but the predominant view is that the question is to be determined from all the provisions of the contract, together with the surrounding circumstances, and that such a provision does not necessarily make the employee a mere servant." 14 *R. C. L.* 69; note to *Messmer v. Bell,* 19 Ann. Cas. 14; *Schneider on Workmen's Compensation,* sec. 37. As drawn, the prayer makes the relation depend upon whether Hayes exercised control and supervision "of the work," without indicating whether the reference was to the means and manner of doing the work, or to the result of the work. And since control by the employer of the result of the work was entirely consistent with the relation of independent contractor (14 *R. C. L.* 68) the prayer was misleading and should not have been granted.

For the errors indicated it will be necessary to reverse the judgment appealed from, and remand the case for a new trial.

> *Judgment reversed, and case remanded for a new trial, appellee to pay the costs.*